SEPTEMBER 2, 1981

No. A–72. GRADDICK, ATTORNEY GENERAL OF ALABAMA v. NEWMAN ET AL. D. C. M. D. Ala. Application for stay,

presented to THE CHIEF JUSTICE, and by him referred to the Court, denied.

Opinion of JUSTICE POWELL.

This case, involving an application and "reapplication" for a stay, arises in a complex and unusual procedural posture. The applicant Charles A. Graddick is the Attorney General of Alabama. Late on the afternoon of July 23 he applied to me as Circuit Justice to stay an order of the District Court for the Middle District of Alabama. The order arose from protracted litigation, commenced in 1971, involving conditions in the Alabama prison system. It directed release of some 400 inmates at midnight on July 24. In order to consider the issues presented, I entered a temporary stay and requested responses. I subsequently denied the application on July 25.

In his application to me as Circuit Justice, Attorney General Graddick did not claim standing as a party to the underlying prison litigation. On the contrary, he came to this Court complaining of the District Court's refusal to grant his motion to *intervene* in that lawsuit. He sought a stay to permit him to appeal following resolution of his claimed right of intervention.

On July 25, the order of the District Court was given effect. More than 200 prisoners were released. Despite this change in the underlying circumstances—which a "stay" would ordinarily be entered to preserve—Graddick promptly filed a "reapplication" for stay with THE CHIEF JUSTICE. THE CHIEF JUSTICE referred this "reapplication," on which we act today, to the full Court.

The "reapplication" was in fact a *new* application. In it Graddick for the first time claimed standing as the successor Attorney General to a party defendant dating back to the original action in 1971. If he is such a party, his motion to intervene was unnecessary.

Crediting Graddick's claim to status as a party, the Court decides today that he is still not entitled to a stay.

## I

In view of the change in Attorney General Graddick's position and the unusual history of this case, and its resulting present posture, I write to summarize the relevant facts and to restate my reasons for concluding that Graddick is not entitled to a stay. The current controversy represents the latest chapter in protracted litigation over conditions in the Alabama prisons. The litigation involves at least three cases, consolidated by the Fifth Circuit in *Newman* v. *Alabama,* 559 F. 2d 283 (1977). See *Newman* v. *Alabama,* 349 F. Supp. 278 (MD Ala. 1972); *Pugh* v. *Locke,* 406 F. Supp. 318 (MD Ala. 1976) (together with *James* v. *Wallace*). The original lawsuits in each of the cases sought redress of alleged constitutional violations in the Alabama prisons. On more than one occasion the District Court has held specifically that the conditions in the Alabama prison system, including overcrowding, violate the rights of inmates under the Eighth and Fourteenth Amendments. See *Newman* v. *Alabama,* 349 F. Supp. 278; *Pugh* v. *Locke, supra; James* v. *Wallace, supra.*

In *Pugh* and *James,* the court awarded far-reaching injunctive relief, and enjoined the defendants from failing fully to implement it. But the status of various defendants has proved a recurring problem in the lawsuits. In *Pugh* and *James* the defendants included the State of Alabama; the Governor of Alabama, George C. Wallace; the Commissioner of Corrections; the Deputy Commissioner of Corrections; the Members of the Alabama Board of Corrections; the State Board of Corrections; and Wardens at various state institutions. In *Newman,* the original complaint also named the Attorney General of Alabama, William J. Baxley, among those from whom relief was sought. On consolidated appeal, the Court of Appeals for the Fifth Circuit upheld most of the relief prescribed in various orders of the District Court, includ-

ing those issued in *Newman* v. *Alabama, supra; Pugh* v. *Locke, supra;* and *James* v. *Wallace, supra.* See *Newman* v. *Alabama,* 559 F. 2d 283. But it also held that certain terms of the order in *Pugh* and *James* must be modified, and it ordered dissolution of the injunction entered against Governor Wallace. This Court then granted certiorari on the limited question whether suits against the State of Alabama and the Alabama Board of Corrections were barred by the Eleventh Amendment. We held that they were. *Alabama* v. *Pugh,* 438 U. S. 781 (1978).

As a result of the decisions by this Court and by the Court of Appeals, the State of Alabama, the Governor of Alabama, and the Alabama Board of Corrections were dismissed as parties. Nonetheless, the District Court retained jurisdiction, and it continued to enter orders and decrees affecting various areas of compliance. The active defendants appear to have been the officials responsible for the management of the State's prison system. The Attorney General appeared as a party infrequently. An exception appears to have occurred in 1977, when the then Attorney General sought to "intervene" in the District Court. The District Court denied the motion as unnecessary, noting that the Attorney General had been named as a defendant in the original complaint in *Newman.* Even after this motion, however, the Attorney General did not continue to participate as a party. Nor does he appear to have been named in any subsequent order of the District Court. When Attorney General Graddick moved to intervene on July 16, it was his first attempt to participate as a party to the action.

The State's principal representative in the recent litigation has been Fob James, elected Governor of Alabama in November 1978. In February 1979, the District Court entered an order naming him as Receiver of the Alabama Prison System. The order provided that all powers, duties, and authority of the Alabama Board of Corrections were transferred to the

Receiver. After James' appointment as Receiver, the Alabama Legislature abolished the Alabama Board of Corrections and transferred its power, duties, and authority to the Governor. See Ala. Code §§ 14–1–15, 14–1–16 (Supp. 1980). Thus, both by court order and by Alabama law, responsibility for the maintenance of Alabama prisons has now rested for more than two years in Governor James.

On October 9, 1980, the District Court found, based on the agreement of the parties, that the Alabama prison system had failed to achieve compliance with standards provided in prior judicial orders. By order of that date, the court established deadlines for the achievement of certain levels of compliance. At a hearing on May 18, 1981, it was stipulated that those deadlines had not been met. On the contrary, it was established that overcrowding had grown more severe. Although the District Court took no immediate remedial action, on May 20 it ordered the Alabama Department of Corrections and the Receiver to submit a list of prisoners "least deserving of further incarceration." Having received such a list, on July 15 it entered the order at issue here, granting a writ of habeas corpus directing the release of some 400 named inmates, all of whom normally were entitled to be released no later than January 8, 1982.

At this juncture the applicant Charles A. Graddick undertook to enter the litigation. On July 16, he filed papers in the District Court seeking to intervene as a party defendant. Purporting to represent the interests of the people of the State of Alabama, he sought a stay of the order granting the writ of habeas corpus. On July 17, Governor Fob James, in his capacity as Receiver, moved to dismiss all motions filed by Attorney General Graddick. The District Court set the Attorney General's motions for hearing on August 6. But it declined to stay its order directing release of the 400 inmates on July 24. On July 22, Attorney General Graddick filed a notice of appeal with the Court of Appeals for the Fifth Cir-

cuit. He also requested a stay pending appeal. The Court of Appeals denied the stay on July 23. Following this denial, Attorney General Graddick filed his application for a stay with me as Circuit Justice.

## II

Our cases establish that an applicant for a stay bears a heavy burden of persuasion. "The judgment of the court below is presumed to be valid, and absent unusual circumstances we defer to the decision of that court not to stay its judgment." *Wise* v. *Lipscomb,* 434 U. S. 1329, 1333 (1977) (POWELL, J., in chambers). The applicant's burden is especially heavy when, as in this case, both the District Court and the Court of Appeals have declined his petitions for stay without dissent. *Beame* v. *Friends of the Earth,* 434 U. S. 1310, 1312 (1977) (MARSHALL, J., in chambers); *Board of Education* v. *Taylor,* 82 S. Ct. 10, 10–11 (1961) (BRENNAN, J., in chambers).

To prevail on an application for stay, an applicant must make a showing of a threat of irreparable injury to interests that he properly represents. See *Bailey* v. *Patterson,* 368 U. S. 346, 346–347 (1961) (*per curiam*). This requirement has two dimensions. The first, embraced by the concept of "standing," looks to the status of the party to redress the injury of which he complains. The second aspect of the inquiry involves the nature and severity of the actual or threatened harm alleged by the applicant. In acting on an application for a stay, a Circuit Justice must " 'balance the equities' . . . and determine on which side the risk of irreparable injury weighs most heavily." *Holtzman* v. *Schlesinger,* 414 U. S. 1304, 1308–1309 (1973) (MARSHALL, J., in chambers); *Beame* v. *Friends of the Earth, supra,* at 1312.

Considering that the burden is on the applicant to establish his entitlement to the extraordinary relief that he requests, on July 25 I denied Graddick's application for a stay. In his papers filed as of that date, Attorney General Graddick

had failed to establish *either* irreparable injury to any cognizable interests *or* his standing to assert the interests to which he alleged that injury had occurred. Graddick had made no allegation that he, either as an official or as a citizen of the State of Alabama, would suffer any individualized injury. His application did aver that "the people of the State of Alabama" would incur irreparable injury if a stay were not granted. But the dimensions of any such injury were cast into serious doubt by the position of the Governor of the State.

Even if Graddick's allegation of irreparable injury were accepted, he had made no showing that he was the proper official to assert that claim. Graddick's original application presented no state-law basis for his attempt to assert the rights of Alabama citizens generally. His standing to represent Alabama's interests in this matter was not self-evident in the unusual context of this case. Alabama statutes had vested responsibility for the prison system in the Governor, and the Governor, who is also the State's chief executive officer, opposed Graddick's application. The Governor averred that he, not the Attorney General, properly represented the State's interests in this case.

Finally, Graddick had failed to show that the "balance of equities" favored the grant of a stay. The District Court had issued its relief order to remedy what it perceived as possible serious violations of constitutional rights. As long ago as 1972, Judge Frank Johnson had determined that conditions in the Alabama prisons failed to satisfy the constitutional minimum. See *Newman* v. *Alabama,* 349 F. Supp. 278 (MD Ala. 1972). Subject to judicial orders for nearly a decade, the State had still failed to achieve compliance with standards established in *Newman.* As I have asserted previously, a Circuit Justice should show great "reluctance, in considering in-chambers stay applications, to substitute [his] view for that of other courts that are closer to the relevant factual

considerations that so often are critical to the proper resolution of these questions." *Times-Picayune Publishing Corp.* v. *Schulingkamp,* 419 U. S. 1301, 1305 (1974) (in chambers); see *Graves* v. *Barnes,* 405 U. S. 1201, 1203 (1972) (POWELL, J., in chambers). Here there was no basis, on the record as presented, to disagree with the two courts below as to the balance of equities.

Established legal criteria thus required that the application for stay should be denied. In so concluding, I was not unaware that the application raised interesting and substantial questions on the merits. These included the propriety of the District Court's use of the writ of habeas corpus as a class remedy for prison overcrowding. But these questions were not properly presented for decision.

### III

In his "reapplication" for a stay, Attorney General Graddick claims standing as a party to the underlying controversy. He also asserts a state-law basis for his claim of authority to represent the interests of the people of the State of Alabama. As I understand them, these averments pertain only to the issue of standing. They do not speak to the other considerations governing the grant of stays by this Court. However the standing question would now be resolved—for I remain uncertain whether Graddick even now has established his standing to seek a stay in the highly unusual context of this case—those considerations continue to require a denial of Graddick's application. He has not met the heavy burden imposed on an applicant who asks us to grant extraordinary relief denied by both the District Court and the Court of Appeals.

### A

Assuming that Graddick now has established his position as a party, he still has failed to show that the "balance of equities" would support a stay. The views of the Governor,

stated above, remain entitled to great weight in assessing the competing risks of irreparable injury. The court-ordered release of prisoners occurred on July 25. Graddick alleges no specific damage that has occurred since then. Moreover, the sudden return of more than 200 former prisoners to jail would present the State with large administrative problems, as well as exacerbating the overcrowding of all prisoners within the Alabama system. A risk of new constitutional rights violations would arise.

In deciding whether to grant extraordinary equitable relief pending appeal, this Court must consider the confusion and disruption that affirmative action might occasion. See, e. g., *Westerman* v. *Nelson,* 409 U. S. 1236 (1972) (Douglas, J., in chambers); *Gomperts* v. *Chase,* 404 U. S. 1237 (1971) (Douglas, J., in chambers); cf. *Mahan* v. *Howell,* 404 U. S. 1201 (1971) (Black, J., in chambers). This equitable concern weighs most heavily in a case, such as this one, in which the applicant has moved with unexplained tardiness. See, e. g., *Westerman* v. *Nelson, supra,* at 1237 (Douglas, J., in chambers) ("[O]ne in my position cannot give relief in a responsible way when the application is as tardy as this one"); *O'Brien* v. *Skinner,* 409 U. S. 1240 (1972) (MARSHALL, J., in chambers).

## B

Additionally, I believe that Graddick's request for a "stay" is now moot. Ordinary linguistic usage suggests that an order, once executed, cannot be "stayed." Affirmative action then becomes necessary to restore the status quo. See *McCarthy* v. *Briscoe,* 429 U. S. 1317, n. 1 (1976) (POWELL, J., in chambers) (although application is styled as seeking a "stay," it actually requests "affirmative relief" and must therefore be considered under different standards governing affirmative relief); *Barthuli* v. *Board of Trustees,* 434 U. S. 1337, 1338–1339 (1977) (REHNQUIST, J., in chambers) ("stay" of state-court decision would not reinstate a discharged employee,

though "the extraordinary interim remedy of a mandatory injunction" would do so).

I do not doubt the power of this Court to enter an injunction ordering restoration of the prior status quo. See 28 U. S. C. § 1651 (a). If it were "necessary or appropriate in aid of" our jurisdiction, *ibid.*, we could order the arrest and imprisonment of all the prisoners released on July 25. But it is settled that our injunctive power "should be used sparingly and only in the most critical and exigent circumstances." *Williams* v. *Rhodes,* 89 S. Ct. 1, 2, 21 L. Ed. 2d 69, 70 (1968) (Stewart, J., in chambers); *Fishman* v. *Schaffer,* 429 U. S. 1325, 1326 (1976) (MARSHALL, J., in chambers). "In order that it be available, the applicants' right to relief must be indisputably clear." *Communist Party of Indiana* v. *Whitcomb,* 409 U. S. 1235 (1972) (REHNQUIST, J., in chambers).

In view of all the legal and factual circumstances of this case, Attorney General Graddick's application falls far distant from this exacting standard.

Opinion of JUSTICE REHNQUIST.

Applicant seeks to stay an order of the United States District Court for the Middle District of Alabama pending an appeal to the United States Court of Appeals for the Fifth Circuit. By that order the District Court issued a writ of habeas corpus mandating the release of some 400 inmates incarcerated in the Alabama prison system. The order also accelerated by six months the parole eligibility dates of a substantial number of other prisoners. Applicant unsuccessfully sought a stay from the District Court and from the Court of Appeals. On July 25, 1981, JUSTICE POWELL also denied a stay, largely on the ground that applicant was without standing to seek the relief requested. Also of significance was the opposition to the stay manifested by Governor Fob James, who possesses authority, under both statute and court order, for administration of the Alabama prison system.

Following JUSTICE POWELL's decision denying a stay, Alabama prison authorities effectuated the District Court's order by releasing more than 200 prisoners. Regardless of whether this event altered the nature of relief that applicant now must seek to obtain a satisfactory result, there is no question that it increased the practical difficulty of arresting the procedural momentum of the District Court's release order on reapplication for a stay. The opinion of JUSTICE POWELL accompanying the Court's denial of the reapplication reflects this fact. See *ante*, at 935–936, 937. Nevertheless, a reapplication was filed and referred to the full Court.

The Court has decided to deny a stay. Had this result been communicated without explanation, the parties might well have been left with the impression that the full Court adopted the rationale of JUSTICE POWELL's opinion accompanying his denial of the original application, *i. e.*, that applicant lacks standing to seek a stay. I write separately to emphasize my view that such an impression would be erroneous.

I

"Standing" is not a term used for its precision. As it is most commonly understood, standing embraces both constitutional and prudential limitations on a federal court's exercise of jurisdiction. So used, it normally measures the quality of the interest asserted by a private plaintiff in obtaining resolution of a particular dispute through the authority of a court. As a threshold inquiry, we have required the plaintiff to show "some threatened or actual injury resulting from the putatively illegal action." *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 617 (1973). Further generalization is hazardous.

In this reapplication, however, the issue of standing has been raised in an unusual setting. The question is whether the chief legal officer of a State, named as a defendant in a suit asserting constitutional limitations on the State's authority and acting as counsel for other state officials, has "stand-

ing" to seek a stay of court orders that suspend the normal operation of the State's laws regarding the confinement of convicted criminals. One might well regard the answer as self-evident. On the assumption that further investigation is warranted, one still might doubt whether conventional methods of analysis are relevant. For example, to ask if the state official has suffered individualized injury from the court's order strikes me as anomalous. The "standing" of a state official to defend against judicial orders that impinge upon the sovereignty of the State derives not from his individualized interest in the suit, but from the authority delegated to the official by the State's citizens to act on their behalf in upholding the laws enacted by their representatives.

The issue of standing as it has been raised in this reapplication, therefore, involves only two questions. First, as a matter of federal law, is applicant's procedural status in the underlying litigation such that he may seek a stay? Second, as a matter of state·law, is applicant acting within his statutory authority in seeking a stay?

At the time the original application was filed the first question was not free from doubt. The applicant had sought to intervene as a matter of right pursuant to Federal Rule of Civil Procedure 24 (a), but the District Court had not yet ruled on the motion. The applicant now maintains, however, that he seeks a stay in his status as a party defendant in this litigation. I am inclined to believe that this new position is the product not of a tactical change of course, but of attention to a question previously neglected due to the press of events. In any event, I am persuaded that the position is correct.

The original complaint in *Newman* v. *Alabama,* Civ. A. No. 3501–N (MD Ala.), filed in 1971, named as a party defendant the Attorney General of Alabama, at that time William J. Baxley. An order issued by the District Court as late as 1977 expressly recognized that the Attorney General was still a party defendant, as well as counsel of record for

the other defendant state officials. In response to Attorney General Baxley's motion for leave to appear as *amicus curiae*, the order recited:

> "This Court finds no necessity for granting the motion of the Attorney General of the State of Alabama to 'intervene' in these cases since the Attorney General is not only a named defendant in *Newman*, but the records of this Court reflect that the Attorney General of the State of Alabama has been counsel of record for defendants in all these cases since their inception." App. N to Brief in Support of Applicant's Reapplication.

Governor James, in his papers opposing the original application, asserted that this Court in *Alabama* v. *Pugh*, 438 U. S. 781 (1978), "restricted the parties to those persons 'responsible for the administration of [Alabama] prisons.'" Objection of Fob James to the Application for Stay 3, n. (quoting *Alabama* v. *Pugh, supra,* at 781). That assertion is without foundation. The narrow question that we considered was whether the Eleventh Amendment barred the District Court's injunction against the State of Alabama and the Alabama Board of Corrections. 438 U. S., at 782, and n. 2. Our affirmative answer resulted in the dismissal of the State and the Board, but had no effect on the remaining parties defendant, whose amenability to suit was an issue not encompassed by our limited grant of certiorari.

In short, the Attorney General of Alabama was named as a party defendant in this litigation, and there is no indication he has ever been dismissed. I would have thought this simple fact conclusive of the question of procedural status, as that question bears on applicant's standing to seek a stay. Nevertheless, it has been argued that applicant's lack of active participation as a party in this litigation prior to the District Court's release order somehow weakens his claim of standing as a party. I am aware, however, of no rule that conditions party status on the appearance of activity or results in auto-

matic dismissal from the lack thereof. Certainly, Charles Graddick has lost nothing by his evident failure to request a formal substitution of parties following his replacement of William Baxley as Attorney General. Federal Rule of Civil Procedure 25 (d) provides that when a public officer ceases to hold office, his successor is *automatically* substituted as a party, regardless of whether the court enters an order of substitution.

Whether applicant's past participation in this litigation has been sufficient to demonstrate vigilance in protection of the State's interests is a question I am not in a position to answer and one that is, in any event, irrelevant to the issue of standing. I do note that applicant has represented the other defendant state officials since commencement of this litigation. There would be little reason for him to participate actively as a party so long as his interests and those of the officials he represents as counsel do not diverge. Applicant has indicated that the District Court's release order has occasioned just such a divergence. While I do not know whether other orders issued by the District Court in the course of this litigation should have called for a response by a vigilant Attorney General acting as a party, I am surely not surprised that this Attorney General has taken exception to an order opening the doors of the State's prisons.

The remaining question, therefore, is whether Alabama law provides the applicant sufficient authority to request a stay of the release order. Two statutes are relevant. The first, Ala. Code § 36–15–12 (1975), authorizes the Attorney General "to institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state." Although the term "other proceedings" does not appear to have been authoritatively construed, it would be incongruous for the term to exclude appeals from actions in which the Attorney General is authorized to participate. See *McDowell* v. *State*, 243 Ala. 87,

89, 8 So. 2d 569, 570–571 (1942) ("We can perceive of no good reason why the express statutory authority of the Attorney General to institute and prosecute suits should not carry with it the implied authority to do all things necessary and proper to their final conclusion"). With respect to the commencement of actions, the Alabama Supreme Court consistently has held that the Attorney General's authority is independent of that of the Governor. *State* v. *Stacks,* 264 Ala. 510, 88 So. 2d 696 (1956) (institution of suit for recovery of funds misused by public officers); *Try-Me Bottling Co.* v. *State,* 235 Ala. 207, 210, 178 So. 231, 232 (1938) (institution of suit to enjoin operation of lottery); *Montgomery* v. *Sparks,* 225 Ala. 343, 344–345, 142 So. 769, 770 (1932) (institution of suit for recovery of public funds).

The second statute, Ala. Code § 36–15–21 (1975), provides that "[a]ll litigation concerning the interest of the state, or any department thereof, shall be under the direction and control of the attorney general . . . ." The Alabama Supreme Court, construing the predecessor of this statute, held that the Attorney General was authorized to settle a suit for the liquidation of a tax claim asserted by the State Department of Revenue, despite the objections of the state official charged with collection of the tax and despite a specific statute conditioning dismissal of such suits on the approval of that official. *State ex rel. Carmichael* v. *Jones.* 252 Ala. 479, 41 So. 2d 280 (1949). The court held that in the absence of specific legislative expression to the contrary, the Attorney General " 'is empowered to make any disposition of the state's litigation which he deems for its best interest.' " *Id.,* at 484, 41 So. 2d, at 284.

These two statutes, taken together, convince me that the Attorney General possesses ample authority under Alabama law to seek a stay of the release order, with or without the consent of the Governor. But any doubts about applicant's authority could have been resolved by adopting the course

this Court pursued in *Massachusetts* v. *Feeney,* 429 U. S. 66 (1976), and certifying the question to the State's highest court. The Supreme Court of Alabama has provided a certification procedure in Alabama Rule of Appellate Procedure 18. I have no reason to second-guess applicant's assessment of the State's interest in ensuring both proper enforcement of duly imposed sentences and unimpeded administration of the statutes and regulations relating to parole. Coupled with the fact that applicant is a party defendant in this litigation, the foregoing conclusion establishes his standing to seek a stay of the District Court's release order.

## II

As explained at the outset, I have decided to state my views on the question of standing to ensure that the Court's denial of the reapplication for a stay does not engender the erroneous impression that applicant is somehow barred from requesting extraordinary relief from orders of the District Court. My decision to so confine my remarks should not be similarly misconstrued as an expression of approval of the District Court's order. JUSTICE POWELL's decision to state his views on the merits of the reapplication, however, have prompted me to depart somewhat from my original intention. In particular, I am compelled to state my disagreement with his assertion that applicant's request for a stay is now moot.

JUSTICE POWELL initially relies on "ordinary linguistic usage" for the proposition that an order, once executed, cannot be "stayed." *Ante,* at 936. I have some doubt whether this proposition is true, even as a matter of linguistic usage. Where an order has been actually effectuated but remains subject to the issuance of temporary common-law writs, such as those authorized by 28 U. S. C. § 1651, it is frequent practice in both federal and state courts to recite that "the mandate is recalled," rather than "the order is stayed."

Linguistics aside, the proposition rests on one of two assumptions of law, both of which are erroneous. The first is

that the legal force of an order is spent once the parties to whom it is directed have complied with the decree. Discharge of a writ of habeas corpus, however, does not exhaust the force of the writ. Until vacated by reversal or a stay, the writ stands as a barrier to the lawful resumption of custody.

The second assumption is that issuance of a stay would be an empty gesture, because a stay exerts no compulsion on the parties to return to the positions they occupied before issuance of the original order. It is, of course, true that a stay does not have the legal effect of an injunction. Unlike an injunction, a stay in this case would not compel Alabama authorities to arrest and imprison those convicts freed by the District Court. It would, however, remove the federal barrier to efforts by the State itself to restore the prior status quo. This much plainly follows from the Court's decision in *Eagles* v. *United States ex rel. Samuels,* 329 U. S. 304 (1946). The petitioner in *Eagles* sought exemption from military service and toward that end filed a petition for a writ of habeas corpus in federal court. The District Court denied the writ, but the Court of Appeals reversed and remanded with instructions to discharge petitioner from military custody. On remand the writ issued and petitioner was unconditionally released. The post commander appealed and this Court rejected petitioner's claim that the case was moot. Noting that his release had been "obtained through the assertion of judicial power," the Court held:

> "It is the propriety of the exercise of that power which is in issue in the appellate court, whether the prisoner is discharged or remanded to custody. Though the writ has been granted and the prisoner released, the appellate court by what it does is not rendering an opinion and issuing an order which cannot affect the litigants in the case before it. . . . Affirmance makes the prisoner's release final and unconditional. *Reversal undoes what*

*the habeas corpus court did and makes lawful a resumption of the custody."* *Id.,* at 307–308 (emphasis added).

See *Michigan* v. *Doran,* 439 U. S. 282, 285, n. 2 (1978); *Carr* v. *Zaja,* 283 U. S. 52, 53 (1931).*

The only action sought by applicant from this Court is a decision "mak[ing] lawful a resumption of the custody." *Eagles* v. *United States ex rel. Samuels, supra,* at 308.  A stay of the release order would achieve that result by removing the federal impediment to applicant's exercise of authority to return the prisoners to confinement.  This request should not be deemed moot simply because he has not asked for more. Although applicant might have encountered further impediments in attempting to return the prisoners to confinement, he chose to confront those problems on his own.  It is enough for now that issuance of a stay would amount to something considerably more than "a mere declaration in the air." *Giles* v. *Harris,* 189 U. S. 475, 486 (1903).

---

*The same conclusion follows from the more familiar line of cases concerning appellate review of judgments involving the payment of money or transfer of property.  Since property transferred or money paid involuntarily pursuant to a judgment can be recovered, execution of the lower court's judgment pending appeal normally does not render the case moot.  *E. g., Cahill* v. *New York, N. H. & H. R. Co.,* 351 U. S. 183, 184 (1956); *Porter* v. *Lee,* 328 U. S. 246, 251 (1946); *Dakota County* v. *Glidden,* 113 U. S. 222, 224 (1885).  These cases represent merely a particularization of the rule that issuance of a court's mandate or obedience to its judgment does not bar timely appellate review.  *Bakery Drivers* v. *Wagshal,* 333 U. S. 437, 442 (1948); *Aetna Casualty Co.* v. *Flowers,* 330 U. S. 464, 467 (1947).