Dana Leigh THOMPSON,
Plaintiff–Appellant,

v.

COUNTY OF FRANKLIN, William
A. Hughes, Treasurer of Franklin
County, Defendants–Appellees.

No. 343, Docket 92–9323.

United States Court of Appeals,
Second Circuit.

Argued Sept. 24, 1993.

Decided Jan. 20, 1994.

Arlinda F. Locklear, Jefferson, MD, for
Appellant.

David E. Peebles, Syracuse, NY (Patrick
M. Connors, Hancock & Estabrook, Syra-
cuse, NY, of counsel), for Appellees.

Before: MESKILL, KEARSE and
WINTER, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the
United States District Court for the North-
ern District of New York, McCurn, J., dis-
missing plaintiff's complaint on the ground

that she lacks standing to challenge a county government's assessment and collection of taxes on her real property that she alleges is within the territorial boundaries of an Indian reservation. For the reasons stated below, we reverse and remand.

## BACKGROUND

Plaintiff-appellant, Dana Leigh Thompson (Thompson), is an enrolled member of the federally recognized St. Regis Mohawk Indian Tribe (Tribe). On January 27, 1989, Thompson purchased sixty-eight acres of land (Property) located in the vicinity of both Franklin County, New York and the St. Regis Mohawk Indian Reservation ("St. Regis Reservation" or "Reservation"). The Property, which is divided into two separate tax parcels, was purchased by Thompson in fee simple.

Commencing with the 1989 tax year, and continuing to present, the defendants-appellees, the County of Franklin and William A. Hughes, Treasurer of Franklin County (collectively "County"), assessed taxes on the Property. Thompson refuses to pay the taxes levied on the Property, however, on the ground that it is situated within the territorial boundaries of the St. Regis Reservation and, thus, beyond the reach of the County's taxing jurisdiction.

Relying on a series of agreements dating back to 1816 (1816 Conveyance Agreements), which convey to the state of New York (State) interests in several tracts of land within the boundaries of the St. Regis Reservation, the County rejected Thompson's claim that her Property lay beyond its territorial jurisdiction to tax. On August 24, 1992, the County filed a tax lien on the Property for the unpaid 1989 taxes. The tax lien, moreover, notified Thompson that outstanding property taxes remained for 1990, 1991 and 1992, in addition to 1989, and that

the County intended to perfect title to the Property by December 28, 1992 if the taxes remained unpaid. As of August 1992, the total amounts of taxes claimed by the County on the Property were respectively $9,491.79 and $820.24.

On September 17, 1992, Thompson filed suit against the County in state court, pursuant to 25 U.S.C. § 233,[1] seeking a declaration that her Property was immune from the County's power to tax real property and an injunction precluding the County from assessing and collecting taxes on the Property and from pursuing any statutory remedies against her for failure to pay those taxes. In her complaint, Thompson alleged (1) the Property is located within the boundaries of the St. Regis Reservation as established by the United States in the Treaty with the Seven Nations of Canada of 1796, 7 Stat. 55 (Treaty of 1796), (2) neither an act of Congress nor the 1816 Conveyance Agreements, to date, have altered the boundaries of the St. Regis Reservation as established by the Treaty of 1796, and (3) the Property is located within the jurisdictional boundaries of the St. Regis Reservation, not the County, for the purposes of taxation.

On October 1, 1992, the County removed the action to the United States District Court for the Northern District of New York and proceeded to file a motion to dismiss the complaint on several grounds. Specifically, the County contended the action was barred by the preclusive or *res judicata* effect of *United States v. Franklin County*, 50 F.Supp. 152 (N.D.N.Y.1943). In the alternative, the County argued that Thompson lacked standing as an individual member of the Tribe to assert a claim that ultimately depended on a tribal right: a challenge to the validity of land conveyances on Indian reservations under the Nonintercourse Act, 25 U.S.C. § 177.[2] In turn, Thompson filed a motion to remand the case to state court pursuant to 28 U.S.C. § 1447(d) on the

---

1. 25 U.S.C. § 233 states in pertinent part:
   That nothing herein contained shall be construed as subjecting the lands within any Indian reservation in the State of New York to taxation for State or local purposes.

2. 25 U.S.C. § 177 states in pertinent part:

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

ground that the district court lacked subject matter jurisdiction over the action under the Tax Injunction Act, 28 U.S.C. § 1341.

In its memorandum of decision, the district court denied Thompson's motion to remand the case to state court. *See Thompson v. County of Franklin,* No. 92–CV–1258, 1992 WL 554369, at \*10 (N.D.N.Y. Nov. 30, 1992). Specifically, the district court found that the Tax Injunction Act did not preclude federal jurisdiction in this matter. Thompson does not appeal the district court's denial of her motion to remand.

Turning next to the County's motion to dismiss, the district court found that Thompson's claim did indeed "turn[ ], in large part, upon whether the series of agreements, beginning in 1816, conveying the Indians' interest in the land of New York State, violated the Nonintercourse Act." The court reasoned that, "even though not mentioned in her complaint," an allegation that the 1816 Conveyance Agreements, on which the County relies for its taxation authority, violate the Nonintercourse Act was a "necessary component" of Thompson's claim. Viewing her action from this perspective, the district court concluded that Thompson was subject to the prudential standing requirements governing all private actions under the Nonintercourse Act, requirements that Thompson as an individual member of the Tribe could not satisfy. Accordingly, the district court dismissed the complaint for lack of standing and never reached the issue of whether her action was barred on the merits under the *res judicata* effect of *Franklin County.* Thompson appeals the district court's ruling that she lacks standing. *Id.* at \*10–\*12.

## DISCUSSION

This appeal raises the issue of whether an individual member of an Indian tribe has standing to challenge the taxing power of a local government over her property which she alleges is located within the historical boundaries of an Indian reservation, but that was previously conveyed from the tribe to non-Indian land owners. Because we hold that an individual member of an Indian tribe has standing to challenge a local government's taxing power in cases, such as this

one, where the individual plaintiff predicates that challenge on the jurisdictional boundaries of the Indian reservation itself, not the validity of the conveyance to non-Indians of land interests located within those boundaries, we reverse the district court's dismissal.

## I. Standard of Review

As a preliminary matter, we note that the unsettled nature of the standing doctrine creates a need for some clarification of the parameters of our review. *See Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 594 (2d Cir.1993) ("standard of review of a dismissal for lack of standing is not quite as clear" as that under 12(b)(6), Fed.R.Civ.P.); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531, at 347–51 (2d ed. 1984) (Wright & Miller) (difficulties with the doctrine "inevitably beset any attempt to articulate and apply any clear principles of standing"). "Standing has been called one of 'the most amorphous [concepts] in the entire domain of public law.'" *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Simply put, "'[s]tanding' is not a term used for its precision." *Graddick v. Newman,* 453 U.S. 928, 938, 102 S.Ct. 4, 10, 69 L.Ed.2d 1025 (1981) (Rehnquist, *J.*).

The district court and the parties appear to treat the issue of Thompson's standing as properly raised on a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), rather than as a defect in federal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). While "we realize that dismissals for lack of standing may be made pursuant to Fed.R.Civ.P. 12(b)(6) rather than 12(b)(1)," *Rent Stabilization,* 5 F.3d at 594, the Supreme Court instructs us that the standing "'inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975)). Indeed, "standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107

L.Ed.2d 603 (1990) (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). Accordingly, as Judge McCurn correctly noted in a prior opinion analyzing an individual member of an Indian tribe's standing to bring a claim under the Nonintercourse Act, "[t]he concept of standing—*even its prudential dimension*—is a limitation on federal court jurisdiction." *Canadian St. Regis Band of Mohawk Indians v. State of New York*, 573 F.Supp. 1530, 1538 (N.D.N.Y.1983) (emphasis added) (citing *Gladstone, Realtors*, 441 U.S. at 99, 99 S.Ct. at 1607; *Warth*, 422 U.S. at 498, 95 S.Ct. at 2204); *see also National Wildlife Fed'n v. United States*, 626 F.2d 917, 924 n. 13 (D.C.Cir.1980).

■ The established view that standing is at heart "a jurisdictional prerequisite to a federal court's deliberations," *Hodel v. Irving*, 481 U.S. 704, 711, 107 S.Ct. 2076, 2080, 95 L.Ed.2d 668 (1987), is of particular interest to us here, where the County asserts a procedural waiver argument. Specifically, the County contends that Thompson is procedurally barred from making certain arguments on appeal in support of her standing because she failed to raise them in the district court.

Our independent obligation to examine subject matter jurisdiction, *FW/PBS, Inc.*, 493 U.S. at 231, 110 S.Ct. at 607, counsels otherwise.[3] "[W]e are required to address [a standing] issue even if the court[ ] below [has] not passed on it ... and even if the parties fail to raise the issue before us." *Id.* at 230–31, 110 S.Ct. at 607. Our obligation, moreover, extends "to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes," *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206, and, thus, constitute "self-imposed ... limitations on our jurisdiction." *National Wildlife*, 626 F.2d at 924 n. 13 (appellee's purported waiver of prudential standing challenge is necessarily ineffective because standing implicates federal jurisdiction); *see also Canadian St. Regis Band of Mohawk Indians*, 573 F.Supp. at 1538 (dismissing *sua sponte* plaintiffs' claims for "want of jurisdiction" where individual plaintiffs cannot meet prudential standing requirements under the Nonintercourse Act). The jurisdictional nature of the standing inquiry, therefore, convinces us that we have an independent obligation to examine Thompson's standing under arguments not raised below, in a case such as this one,

**3.** Similarly, we recognize that this obligation creates a corresponding duty to review the district court's implicit threshold determination that the Tax Injunction Act does not preclude federal jurisdiction in this case, an issue that neither party raises on appeal and one which Thompson expressly seeks to waive. In so doing, we are cognizant that the district court considered the jurisdictional impact of the Tax Injunction Act in the context of a motion to remand pursuant to 28 U.S.C. § 1447(c), rather than as a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). Our authority to review a district court's ruling on a motion to remand for lack of subject matter jurisdiction, however, is limited. *Compare* 28 U.S.C. § 1447(d) (order remanding case to state court for want of federal jurisdiction pursuant to section 1447(c) is not reviewable on appeal) *with* Wright & Miller, § 3740 nn. 12, 19, at 596–97, 599 (and cases cited therein) (denials of remand are reviewable on appeal but may be subject to waiver) *and Sheeran v. General Elec. Co.*, 593 F.2d 93, 97–98 (9th Cir.), *cert. denied*, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979).

The limits on our power to review the district court's denial of Thompson's motion to remand, however, do not prohibit us from re-

viewing the district court's implicit finding of subject matter jurisdiction over this action. Rather, where a denial of a motion to remand is predicated on a finding of federal jurisdiction, "the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court." *Grubbs v. General Elec. Credit Corp.*, 405 U.S. 699, 702, 92 S.Ct. 1344, 1347, 31 L.Ed.2d 612 (1972). Thus, despite the procedural context in which the jurisdictional issue arises, Thompson's decision to waive review of the district court's denial of her motion to remand pursuant to 28 U.S.C. § 1447(c) does not negate our independent obligation to insure that federal jurisdiction is not extended beyond the limits of Article III, and review is appropriate in this case.

To that end, we agree with the district court that the Tax Injunction Act does not preclude federal jurisdiction in this case. We see no reason to expand on the district court's opinion in light of Judge McCurn's thorough analysis of the issue. *See Thompson*, 1992 WL 554369, at *3–*10. Accordingly, we are satisfied that the Tax Injunction Act does not preclude jurisdiction in this case and proceed to consider the other issues raised on appeal.

where the underlying claims and theories of the action itself remain unchanged from those alleged in the complaint.

■■■ Similarly, the standard by which we review dismissals for lack of standing is somewhat murky. We recently stated that "we must modify our standard of review of 12(b)(6) dismissals in the standing context" and "adopt the standard used by several of our sister circuits to review dismissals under 12(b)(1)." *Rent Stabilization*, 5 F.3d at 594. Thus, if the district court based its finding that a party lacks standing on either the complaint alone or the complaint supplemented by undisputed facts gleaned from the record, our review is *de novo. Id.; see also Herbert v. Nat'l Academy of Sciences*, 974 F.2d 192, 197 (D.C.Cir.1992); *Ynclan v. Dep't of Air Force*, 943 F.2d 1388, 1390 (5th Cir. 1991). Conversely, if the district court is obliged to resolve disputed issues of fact in order to determine a party's standing, we accept those factual findings unless they are shown to be "clearly erroneous." *Rent Stabilization*, 5 F.3d at 594. Here, the district court did not resolve any factual disputes. Thus, our review of the district court's dismissal is entirely *de novo. Id.*

Standing, moreover, like other jurisdictional inquiries, "cannot be 'inferred argumentatively from averments in the pleadings,' … but rather 'must affirmatively appear in the record.'" *FW/PBS, Inc.*, 493 U.S. at 231, 110 S.Ct. at 608 (citations omitted). To that end, "it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' … 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *Id.* (citation omitted) (quoting *Warth*, 422 U.S. at 518, 95 S.Ct. at 2215).

When considering a party's standing, we "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206. Additionally, we note that "it is within the [district] court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Id.* Thus, if after considering all of the relevant materials, we are

unable to discern a basis for the plaintiff's standing, the complaint must be dismissed.

Finally, we are mindful that "[a]lthough standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, … it often turns on the nature and source of the claim asserted." *Id.* at 500, 95 S.Ct. at 2206 (citation omitted). "[T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing." *Id.* Thus, where, as here, issues of the prudential limitations on standing arise, a plaintiff's standing turns on "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.*

## II. *Thompson's Standing*

■■■ With these principles in mind, we turn now to the issue of whether Thompson has standing to challenge the County's jurisdiction to levy taxes on her Property.

In dismissing Thompson's complaint for lack of standing, the district court characterized her claim as ultimately depending on a finding that the 1816 Conveyance Agreements were invalid under the Nonintercourse Act. Thompson concedes that if her claim ultimately turns on a violation of the Nonintercourse Act, a statute that provides a cause of action only for collective Indian tribes, not the individual members of a tribe, *see United States v. Dann*, 873 F.2d 1189, 1195 (9th Cir.), *cert. denied*, 493 U.S. 890, 110 S.Ct. 234, 107 L.Ed.2d 185 (1989); *James v. Watt*, 716 F.2d 71, 72 (1st Cir.1983), *cert. denied*, 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984); *Epps v. Andrus*, 611 F.2d 915, 917–18 (1st Cir.1979); *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 579 (1st Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979); *Canadian St. Regis*, 573 F.Supp. at 1535–36, she would lack standing to bring this action. Thompson, however, insists that the district court mischaracterized her action as ultimately depending on a violation of the Nonintercourse Act, because it failed to understand that her claim turns on the fundamental distinction between *title* to property located *within* a reservation and

the jurisdictional boundaries *of* the reservation itself.

Specifically, Thompson argues that the complaint, which never mentions the Nonintercourse Act, challenges the County's taxing power under the theory that it lacks jurisdiction to assess taxes on real property located within "Indian country" as Congress defined that term in 18 U.S.C. § 1151. In support of this theory, the complaint avers that the 1816 Conveyance Agreements granting the State title to lands within the Reservation, the documents relied on by the County for its authority to tax the Property, did nothing to alter the jurisdictional boundaries of the St. Regis Reservation. Instead, those boundaries are defined by the Treaty of 1796 and allegedly have not been diminished. Because the complaint alleges that the 1816 Conveyance Agreements go only to the issue of *title* to land located *within* the boundaries of the St. Regis Reservation, not the issue of the boundaries themselves, Thompson contends the validity of the 1816 Conveyance Agreements are irrelevant to her claim that the County cannot assess taxes on property located *within* the Reservation regardless of who holds title to that property. Thompson notes, moreover, that the validity of *her* own title to the Property in this case depends on the validity of the 1816 Conveyance Agreements. As a result, Thompson argues that it would be ludicrous for her to create a *de facto* challenge to the validity of her own title by challenging the validity of the 1816 Conveyance Agreements under the Nonintercourse Act. Accordingly, Thompson posits that the district court erred in characterizing her claim as ultimately depending on a violation of the Nonintercourse Act and dismissing the complaint for lack of standing thereunder. We agree.

A unanimous Supreme Court instructs that the "cases make clear that a tribal member need not live on a formal reservation to be outside the State's taxing jurisdiction; *it is enough that the member live in 'Indian country.'*" *Oklahoma Tax Comm'n v. Sac & Fox Nation,* —— U.S. ——, ——, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993) (emphasis added). When determining whether a local or state authority has taxing power over members of a recognized Indian tribe, therefore, the perimeters of the formal reservation are irrelevant; "[i]nstead, we ask *only* whether the land is Indian country." *Id.* (emphasis added).

Congress defined Indian country "broadly to include formal and informal reservations ... and Indian allotments, whether restricted or held in trust by the United States." *Id.* (citing 18 U.S.C. § 1151). Prior to that statutory definition, "[I]ndian lands were judicially defined to include *only* those lands in which the Indians held some form of property interest." *Solem v. Bartlett,* 465 U.S. 463, 468, 104 S.Ct. 1161, 1165, 79 L.Ed.2d 443 (1984) (emphasis added). In 1948, however, with the enactment of the statutory definition of Indian country, "Congress uncouple[d] reservation status from Indian ownership, and statutorily define[d] Indian country to include lands held in fee by non-Indians *within* reservation boundaries." *Id.* (emphasis added). Thus, the mere conveyance of reservation property to non-Indians does not necessarily disestablish the reservation boundaries for jurisdictional purposes. *See id.; see also Mattz v. Arnett,* 412 U.S. 481, 497, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973).[4]

---

**4.** Thompson and the County spend much time debating whether the boundaries of an Indian reservation can be diminished in the absence of congressional action. Again, the absence or existence of congressional action and its impact on St. Regis Reservation boundaries are issues involving the merits of Thompson's claim. We are cognizant of the proposition articulated by our sister Circuit that:

> diminishment [of reservation boundaries] will not be lightly inferred. *Solem,* 465 U.S. at 472, 104 S.Ct. at 1167. Congress must clearly evince the intent to reduce boundaries, *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 615, 97

S.Ct. 1361, 1377, 51 L.Ed.2d 660 (1977), and traditional solicitude for Indian rights favors the survival of reservation boundaries in the face of the opening up of reservation lands to settlement and entry by non-Indians. *Solem,* 465 U.S. at 472, 104 S.Ct. at 1167.

*Pittsburg & Midway Coal Mining Co. v. Yazzie,* 909 F.2d 1387, 1393 (10th Cir.), *cert. denied,* 498 U.S. 1012, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). We offer no view, however, as to the application of this proposition in this case. Whether this presumption concerning reservation boundaries applies in the context of a conveyance of reservation property from the tribe to

The district court's dismissal of Thompson's action, however, rests on a contrary premise: that the 1816 Conveyance Agreements conveying to the State the Tribe's title to land located within the boundaries of the Reservation automatically uncoupled that land from the boundaries of the Reservation as originally established by the Treaty of 1796. While we offer no view on the merits of the ultimate issue in this case—whether the 1816 Conveyance Agreements altered the boundaries of the St. Regis Reservation and thereby removed the Property from Indian country—there is nothing in the record before us at this stage in the proceedings to support a finding by the district court that they did.

Viewed from this perspective, the district court's implicit finding, in the context of its standing analysis, that the 1816 Conveyance Agreements diminished the boundaries of the St. Regis Reservation is, at best, premature. Indeed, as her claim is pled in the complaint, a ruling that the 1816 Conveyance Agreements legally diminished the Reservation's boundaries would entitle the County to a judgment on the pure merits of this action. Although the possibility always exists that a ruling on the merits in favor of the County might trigger satellite litigation challenging the validity of the Conveyance Agreements under the Nonintercourse Act, that issue, as Thompson contends, is irrelevant to the disposition of this action. The issue of the territorial boundaries of the St. Regis Reservation, the ultimate issue in this lawsuit and the one for which Thompson seeks an affirmative declaration from the district court, therefore, is best analyzed on the merits, either on a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), on cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56, or, if need be, at trial.

Our conclusion that the Nonintercourse Act is irrelevant to Thompson's challenge to

the County's taxing power, however, does not end the inquiry into whether she has standing to bring this lawsuit. Indeed, our conclusion that her claim does not depend on a violation of the Nonintercourse Act is in no way dispositive of whether Thompson has standing to challenge the County's taxing authority by seeking a judicial determination of the territorial boundaries of the St. Regis Reservation, a determination that the County contends implicates tribal, rather than individual, rights. In light of our independent obligation to inquire into the standing of litigants to bring actions in the courts below, we proceed to determine whether Thompson has standing to bring this lawsuit.

The County provides no case law for the proposition that prudential limitations on standing require that only tribal representatives be empowered to challenge a local government's jurisdiction to tax where such a challenge implicates a determination of the territorial jurisdiction of an Indian reservation. Instead, the County offers us a prudential standing argument rooted in practical policy concerns. Specifically, the County argues that the determination of reservation boundaries is an issue of paramount importance to entire Indian tribes as well as other governments. The County insists that to allow an individual landowner to seek a judicial determination of an Indian reservation's territorial boundaries, a claim that is inherently tribal in scope, would place established tribal borders in jeopardy, give rise to a series of potentially conflicting determinations, and ultimately disrupt tribal rights across the United States. We disagree.

Thompson seeks a determination that her Property is located within "Indian country," as Congress defined that term pursuant to 18 U.S.C. § 1151.[5] In addition, Thompson challenges the County's authority to tax property located within Indian country under 25

---

a sovereign state, as is the case here, rather than in the context of the opening up of Indian lands by the federal government to homesteading by private, non-Indian settlers, moreover, is an issue to be decided first in the district court.

**5.** 18 U.S.C. § 1151 states in pertinent part:
the term "Indian country" ... means (a) all land within the limits of any Indian reservation

under the jurisdiction of the United States Government ..., (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished.

U.S.C. § 233 and federal case law. We find nothing in either of those statutes or the case law to suggest that the filing of actions challenging a government's taxing authority on territorial grounds is limited exclusively to tribal plaintiffs. *See McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 169, 173, 93 S.Ct. 1257, 1260, 1262, 36 L.Ed.2d 129 (1973) (extending territorially derived principles of criminal jurisdiction to taxing authority cases and holding that state lacked jurisdiction to tax an individual tribe member living within the territorial boundaries of the reservation); *Soldier v. Carlson,* 350 F.Supp. 65, 66 (D.S.D.1972) (granting declaratory judgment that county government had no authority to tax mobile homes located in Indian country and owned by Indians in action filed by individual Indian plaintiffs); *see also Solem,* 465 U.S. at 481, 104 S.Ct. at 1171 (court entertained a habeas corpus action filed by individual tribe member that raised issue of whether an act of Congress opening up reservation to homesteading diminished reservation boundaries). *But cf. Sac & Fox Nation,* —— U.S. at ——, 113 S.Ct. at 1990–91 (state's jurisdiction to tax predicated on a determination of whether the tax transaction in issue took place on Indian country as defined by 18 U.S.C. § 1151 in case brought by entire Sac & Fox tribe and all residents of its territorial jurisdiction).

We are mindful that the cases prohibiting individual tribe members from bringing claims under the Nonintercourse Act draw heavily on concerns that the invalidation of land treaties under the Act involves the vindication of rights that are exclusively tribal in nature. *See, e.g., James,* 716 F.2d at 72; *Epps,* 611 F.2d at 917. The view that the Nonintercourse Act protects only tribal rights, however, is derived from an analysis of the language of the Act itself as implying a private cause of action to tribes *only. See James,* 716 F.2d at 72; *Epps,* 611 F.2d at 917; *see also* 25 U.S.C. § 177. The rationale underlying the settled view that the Nonintercourse Act protects only tribal rights, therefore, offers us no insight into whether the rights at issue in this action, an action we find to be unrelated to the Nonintercourse Act, are exclusively tribal in nature.

Similarly, we find no basis for the County's claim that an action initiated by individual members of an Indian tribe challenging a local government's tax on the basis of territorial jurisdiction impedes tribal rights and threatens established reservation boundaries to a degree that requires self-imposed, prudential limitations on our jurisdiction. " 'No principle is better settled than that the power of a [government], even its power of taxation, in respect to property, is limited to such as is within its jurisdiction.' " *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 342, 74 S.Ct. 535, 537, 98 L.Ed. 744 (1954) (quoting *New York, L.E. & W.R.R. Co. v. Pennsylvania,* 153 U.S. 628, 646, 14 S.Ct. 952, 958, 38 L.Ed. 846 (1894)). "Where there is jurisdiction neither as to person nor property, the imposition of a tax would be *ultra vires* and void." *Id.* The case law is clear, that the federal courts, in their affirmance of this most basic principle of taxation, will not shy away from vindicating the rights of individual taxpayer plaintiffs where the government seeking to impose the tax "ha[s], in fact, cast [its] tax burden upon property located beyond [its] borders." *Norfolk & W. Ry. Co. v. Missouri State Tax Comm'n,* 390 U.S. 317, 325, 88 S.Ct. 995, 1000, 19 L.Ed.2d 1201 (1968) (citing *Southern Ry. Co. v. Kentucky,* 274 U.S. 76, 81–84, 47 S.Ct. 542, 544–45, 71 L.Ed. 934 (1927); *Wallace v. Hines,* 253 U.S. 66, 69–70, 40 S.Ct. 435, 436–37, 64 L.Ed. 782 (1920); *Union Tank Line Co. v. Wright,* 249 U.S. 275, 283–86, 39 S.Ct. 276, 278–80, 63 L.Ed. 602 (1919); *Fargo v. Hart,* 193 U.S. 490, 499–503, 24 S.Ct. 498, 499–501, 48 L.Ed. 761 (1904)); *see also Humble Pipe Line Co. v. Waggonner,* 376 U.S. 369, 374, 84 S.Ct. 857, 860, 11 L.Ed.2d 782 (1964) (holding, in action initiated by individual corporation, that state has no jurisdiction to levy tax on property owned by private corporation located on federal military base, which the federal government acquired by donation from the state); *Soldier,* 350 F.Supp. at 66 (granting declaratory judgment to individual Indians that they are immune from county property taxes levied on mobile homes located within Indian country); *Coleman Bros. Corp. v. City of Franklin,* 58 F.Supp. 551, 553–54 (D.N.H.) (awarding individual taxpayer recovery of municipal property taxes paid under protest

where real property in issue was located on land acquired by the federal government and, thus, beyond the taxing jurisdiction of a municipality), *aff'd in part and rev'd in part,* 152 F.2d 527, 530–31 (1st Cir.1945) (taxpayer may maintain an action in federal court for recovery of taxes paid under protest where jurisdiction to impose those taxes was lacking), *cert. denied,* 328 U.S. 844, 66 S.Ct. 1026, 90 L.Ed. 1618 (1946); *cf. Mississippi River Fuel Corp. v. Cocreham,* 390 F.2d 34 (5th Cir.) (holding, in action by taxpayer to recover severance taxes paid under protest, that the state lacked jurisdiction to tax private corporation located on federal military base), *cert. denied,* 390 U.S. 1015, 88 S.Ct. 1264, 20 L.Ed.2d 164 (1968). We fail to see how allowing Thompson to attempt to vindicate this same right will create any more discord than the plethora of lawsuits routinely brought in federal courts by individual non-Indian, and Indian, taxpayers alike, who challenge the territorial boundaries of a government's taxing jurisdiction. Despite the County's concerns, therefore, we fail to discern any viable basis, in law or policy, to conclude that prudential standing concerns in this case are any greater than those present in other taxpayer actions.

Viewed in this light, Thompson's standing is dictated by our analysis of taxpayer standing in *United States v. City of New York,* 972 F.2d 464 (2d Cir.1992). In that case, we announced that an individual, municipal taxpayer has standing to challenge the imposition of an allegedly illegal expenditure when she brings a " 'good-faith pocketbook action.' " *Id.* at 471 (citation omitted). Here, there is nothing in the complaint or record to indicate that Thompson has not brought a "good-faith pocketbook action." Thompson simply seeks to prevent the County from assessing and collecting property taxes that she alleges exceed the County's jurisdiction. Clearly, her alleged injury—the assessment and collection of illegal taxes on her Property—" 'can be traced to the challenged action' " and, as such, will " 'likely ... be redressed by a favorable decision.' " *Id.* at 470 (citations omitted). Accordingly, we conclude that Thompson has standing to bring this action challenging the County's power to tax her Property.

## III. *Res Judicata*

In addition to challenging Thompson's standing, the County seeks to dismiss her action under the doctrine of *res judicata.* Specifically, the County contends that *United States v. Franklin County,* 50 F.Supp. 152 (N.D.N.Y.1943), is dispositive of the legal insufficiency of Thompson's claim in this case. Despite the district court's express refusal to rule on the preclusive effect of *Franklin County* in this case, the parties invite us to rule on that issue. We decline.

As an initial matter, we note that the doctrine of *res judicata* or issue preclusion in no way implicates jurisdiction. *Res judicata* challenges may properly be raised via a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See* 5A Wright & Miller § 1357, at 356 n. 69; *see also Southard v. Southard,* 305 F.2d 730, 732 n. 1 (2d Cir. 1962) (noting that a claim of *res judicata* is properly raised on a motion under Rule 12(b)(6)); *see also Exchange Nat'l Bank v. Touche Ross & Co.,* 544 F.2d 1126, 1130–31 (2d Cir.1976) (unlike dismissals under Rule 12(b)(6), dismissals for lack of subject matter jurisdiction are not on the merits and are not accorded *res judicata* effect). Thus, unlike the standing inquiry, we have no independent obligation to resolve the County's *res judicata* claim as a court of first instance.

The law does make clear that "an appellate court may affirm a judgment of a lower court upon a theory not considered below." *Poloron Prods. v. Lybrand Ross Bros. & Montgomery,* 534 F.2d 1012, 1018 (2d Cir.1976). The preferred practice of this Circuit, however, is to remand the issue for consideration by the district court in the first instance where, as here, "such a theory has been briefed and argued only cursorily in this Court." *Id.*

Practical considerations, moreover, counsel against our review of the *res judicata* issue at this time. *Res judicata* inquiries often require a detailed analysis of a developed record. As such, the issue is not always suited to an initial consideration on an appeal taken during the early stages of the proceedings. Accordingly, we believe prudence counsels that the claimed preclusive effect of

254

*Franklin County* should be considered initially by the district court, the court of first instance.

## CONCLUSION

For the reasons stated above, we hold that Thompson has standing to bring this action and we reverse the district court's dismissal of the complaint. We remand the case to the district court with instructions that the complaint should be reinstated for further proceedings on the merits, including whether the *res judicata* effect of *Franklin County* precludes this action as a matter of law.