**BROWN**

v.

**DAMIANI**

No. 3:00CV1810(JBA).

United States District Court,
D. Connecticut.

Oct. 16, 2002.

Moyahoena N. Ogilvie, Cummings & Lockwood, Hartford, CT, Martin B. Margulies, Hamden, CT, Philip D. Tegeler, Conn. Civ. Lib. Union Foundation, Hartford, CT, for Alan Brown.

Mark F. Kohler, Eliot D. Prescott, Karla A. Turekian, Clare E. Kindall, Attorney General's Office, Hartford, CT, for Richard Damiani.

### Order of Dismissal

ARTERTON, District Judge.

Alan Brown, a self-described "internet reporter," brings this action against the Hon. Richard Damiani, a judge of the Superior Court for the State of Connecticut, in defendant Damiani's official capacity. Brown challenges the constitutionality of a gag order issued by Judge Damiani in the context of juvenile court proceedings involving "Baby B" as infringing his right to receive information. This case was tried to the bench on July 11, 2002, and having heard the evidence, the Court concludes that plaintiff has failed to prove his standing and this case must therefore be dismissed for lack of subject matter jurisdiction.

I.

In October 1998, DCF removed Baby B from the care and custody of Ms. B, and nine days later Ms. B filed a petition for a writ of habeas corpus in the Connecticut Superior Court seeking the child's return. Further proceedings, both in the state court and through the DCF administrative process, were conducted. Transcripts of proceedings and filings in several of the court proceedings show that Ms. B contacted public officials and members of the media, although the precise substance and scope of those contacts is not part of the evidentiary record before the Court.

During the proceedings in state court, several gag orders were issued that prohibited Ms. B from disclosing identifying information about Baby B and information about the juvenile court proceedings. On February 22, 2000 a gag order was issued by Judge Damiani, which Ms. B appealed.

The Connecticut Appellate Court affirmed Judge Damiani in all respects, *In re Brianna B.*, 66 Conn.App. 695, 785 A.2d 1189 (2001), and Ms. B. did not seek further review by the Connecticut Supreme Court.

Brown initiated this suit to challenge the February 22, 2000 gag order. Shortly before trial of this case, however, Judge Damiani issued an Amended Order on April 15, 2002 that expressly revokes all previous orders and thus is the only extant order directed to communications by Ms. B relative to the juvenile court proceedings involving Baby B. The prospective relief Brown seeks therefore can only relate to the April 15, 2000 order, since any alleged constitutional violation in the revoked February 22, 2000 order can no longer be " 'redressed by a favorable judicial decision.' " *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (*quoting Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)); *see Church of Scientology v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) ("a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it' ") (*quoting Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895)).

While an otherwise moot case may still be open for review if the underlying facts are "capable of repetition, yet evading review," this doctrine is limited to situations where, *inter alia,* there exists "a reasonable expectation that the same complaining party w[ill] be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). Because the February 22, 2000 order has been superseded, Brown has not shown that anyone willing to share information with him will again be subject to it.

*See also Dow Jones & Co. v. Kaye,* 256 F.3d 1251, 1257 (11th Cir.2001) (controversy giving rise to gag order was moot and not within the capable of repetition yet evading review doctrine when "[e]ven though Florida state trial judges may in the future issue similar gag orders in civil cases, [the] challenged act is not necessarily in its duration too short to be fully litigated prior to cessation or expiration.") (internal quotations and citations omitted).

Thus, the subject of this lawsuit is the April 15, 2002 amended order, which reads:

> This order shall replace any prior orders governing communications by Ms. B related to the juvenile court proceedings involving [Baby B].
>
> Ms. B shall not disclose to any person or entity the following information, as well as any information obtained in the course of any juvenile court proceeding involving [Baby B]. For the purpose of this order, the term "information" includes, without limitation:
>
> (1) The full name and address of [Baby B];
>
> (2) The name, address, occupation or employer of [Baby B]'s foster or adoptive parents.;
>
> (3) The name or address of any witness in any juvenile court proceeding involving [Baby B];
>
> (4) Any transcript, transcript summary, or other communication about the substance of the testimony of any witness to any juvenile court proceeding involving [Baby B];
>
> (5) Any exhibit, photocopy, reproduction or other replica thereof, or any description of any exhibit offered by any party to the court during the juvenile court proceeding involving [Baby B];
>
> (6) Any pleadings submitted to the juvenile court by an[y] party in relation to

juvenile court proceedings involving [Baby B].

Except as to the information listed above in items (1)-(6), this order shall not apply to matters of which Ms. B had personal knowledge prior to the juvenile court proceeding involving [Baby B].

This order shall not apply to any communication Ms. B may have with the Connecticut Office of the [C]hild Advocate or with any legislative representative.

Brown does not challenge the portions of the order prohibiting the disclosure of identifying information about any party or witness; specifically, there is no challenge to ¶¶ 1, 2 and 3. When this unchallenged portion is removed, Brown's challenge is to the judicial prohibition on Ms. B's communication of knowledge she obtained during the course of the juvenile court proceedings to anyone other than the Child Advocate or Ms. B's legislative representative. This includes two general categories of information: information that Ms. B would not have acquired but for her presence and participation in the juvenile court proceeding; and information about the substance of the proceeding itself. Thus, the challenged portion of the order allows Ms. B to disseminate information which she acquired apart from the juvenile court proceedings, even if that information may have also have been the substance of testimony or presented in exhibit form during the juvenile court proceeding (so long as Ms. B did not disseminate that [or how] the information was used in the hearing). Thus, for example, if Ms. B had previously known that Baby B had been diagnosed with a certain medical condition, and evidence related to this condition was elicited at the hearing through testimony and records from Baby B's physician, Ms. B would not be prohibited by the order from disclosing the fact that Baby B had the condi-

tion; she would only be prohibited from disclosing the fact or substance of Baby B's physician's testimony at the hearing.

## II.

Brown, who had no legally-protected interest in the outcome of the juvenile proceeding itself, claims that his right to receive information from Ms. B about the proceedings has been infringed by the gag order. He claims no First Amendment right to personally attend the proceedings, and it is beyond dispute that the gag order is directed only to Ms. B, who is not a plaintiff and whose challenge to the order was rejected by the Connecticut Appellate Court.

"Article III, § 2 of the Constitution extends the 'judicial Power' of the United States to actual 'Cases' and 'Controversies.'" *Utah v. Evans,* 536 U.S. 452, 122 S.Ct. 2191, 2197, 153 L.Ed.2d 453 (2002). Of all the doctrines that "'cluster about Article III,'" including mootness, ripeness, and the political question doctrine, standing "is perhaps the most important." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (*quoting Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–1179 (1982) (Bork, J., concurring)). "[T]he irreducible constitutional minimum of standing contains three elements":

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative,

that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations, quotations and footnote omitted).

Because the First Amendment "unwaveringly protects the right to receive information and ideas," *In re Application of Dow Jones & Co.,* 842 F.2d 603, 607 (2d Cir.1988), potential recipients of speech restrained by a judicial gag order have standing to challenge such an order, *id.* at 608. To demonstrate an injury to his First Amendment rights sufficient to confer jurisdiction, Brown must demonstrate that but for the challenged order, Ms. B is willing to share information prohibited by the order from being disclosed. *See id.* at 607 (standing inquiry requires court to consider "[w]hether the news agencies are actually potential receivers of otherwise restrained speech"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both.") (citing a stipulation of record that but for the prohibition at issue, some willing speakers would exist); *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 838–839 (3rd Cir.1996) ("third parties have standing to challenge a gag order only when there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so") (citations omitted). As the party invoking federal jurisdiction, Brown bears the burden of establishing the existence of the standing his complaint alleges. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (*citing FW/*

*PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)).

In *Dow Jones,* the court found that the plaintiff news agency had standing, even where no person bound by the gag order challenged it on appeal, because the record demonstrated that absent the gag order, the persons bound by it would, in fact, have chosen to speak to the media, presumably if only because the other parties would:

> The record clearly supports the district court's conclusion that the news agencies are in fact potential recipients of speech by the prosecutors, defense counsel, and the defendants in the underlying Wedtech case. * * * Plainly, a group of attorneys let loose to speak on Wedtech's activities would add to an already rampant flood of out-of-court publicity. It is hard, in fact, to imagine that there are no willing speakers. Without them there would be no need for a restraining order; it would be superfluous. * * * [W]hether or not defendants and their counsel desire media coverage, the record reveals that were they not restrained, such persons would also be willing speakers. These findings by the district court as to the willingness of the various individuals to speak are not clearly erroneous.

842 F.2d at 607–608.

In *Virginia State Board of Pharmacy,* a case involving consumers' rights to receive prescription drug price information, the Supreme Court relied on the parties' factual stipulation in concluding that but for the prohibition at issue, willing speakers existed: "In the absence of Section 54–524.35(3), some pharmacies in Virginia would advertise, publish and promote price information regarding prescription drugs." 425 U.S. at 755 n. 14, 96 S.Ct. 1817. In *FOCUS,* an appeal from dismissal of the

complaint, the Third Circuit's analysis was necessarily limited to the pleadings:

> "Looking at the allegations in the verified complaint in the light most favorable to the plaintiffs here, there are reasons to conclude that the plaintiffs have adequately met a 'willingness of the speaker' requirement for standing at this stage of the litigation. As we have noted, while neither party to the Baby Byron case is on the record as being opposed to the gag orders, the Derzacks at least were willing to talk at some point prior to the entry of the gag orders; The complaint alleges that the Derzacks 'recently released a book detailing their experiences with Byron and their frustration with CYS and the courts.' Moreover, the complaint further alleges that the judge 'has threatened to remove Byron from the Derzack[s'] home if the Derzacks appear publicly to promote their book or otherwise discuss their case." It is reasonable to infer from these allegations that the Derzacks are willing but restrained speakers who dare not challenge the gag orders for fear of reprisal from the judge. At this stage, we must accept these allegations and this permissible inference in the plaintiffs' favor.

*Id.* at 839 (citations omitted). The court expressly noted, however, that on remand, "[t]he plaintiffs must prove that the Baby Byron parties are willing to talk publicly about that case. If the district court, at any point, concludes to the contrary on the basis of an appropriate record, then it should proceed no further." *Id.* (footnote omitted).

### III.

Although the Court has previously determined that the allegations in Brown's complaint were sufficient to support standing, "a court's refusal to dismiss an action for lack of standing does not relieve the plaintiff of the burden of actually proving standing" at trial. *Defenders of Wildlife v. Lujan,* 911 F.2d 117, 120 (8th Cir.1990), *rev'd on other grounds,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *accord Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 n. 21, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *U.S. v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 688–689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Thus, Brown had the burden of proving at trial that Ms. B (the only person restrained by the challenged gag order) would be willing, but for the existence of the order, to speak with him about matters prohibited by the challenged portions of the gag order. Without such a nexus, Brown has an insufficient immediate and concrete interest to allow him to prosecute this case. *See Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("gist" of standing is whether party has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions").

Despite the fact that the defense indicated in its pretrial memorandum that the factual basis of plaintiff's standing was very much at issue in this case,[1] Ms. B was not called to testify at trial and no deposition testimony taken from her was offered. Plaintiff's sole fact witness was Brown, who testified only that he had spoken to Ms. B regarding whether she would be

---

1. *See, e.g.,* Defendant's Pretrial Memorandum [Doc. # 52] at 26 ("At the outset, it is critical to recognize that the plaintiff can offer no evidence that there is a willing speaker from whom he can receive information. Although his complaint may allege that Ms. B. is a willing speaker, he cannot prove this allegation essential to his standing.").

willing to talk further with him. Brown's testimony does not contain any indication as to whether Ms. B, in fact, remains willing to speak with him now that her own litigation battle has been concluded and lost. The only additional evidence, consisting primarily of transcripts of certain portions of the juvenile court proceedings and pleadings, fails to support an inference that Ms. B continues to seek to share covered information with Brown, particularly given the significant developments that have transpired since the complaint was filed.

In Baby B's guardian *at litem*'s July 9, 1999 motion for protective order, Pl's Ex. 6, it is alleged that Ms. B "submitted confidential information regarding [Baby B] via the internet to the following individuals and organizations": Hillary Rodham Clinton, Tipper Gore, Governor Rowland, Sen. Dodd, Sen. Lieberman, Sen. Gejdenson, Sen. Cook, Sen. Sullivan, Sen. Handley, Rep. Winkler, the Commission on Children, Center for Child Advocacy, Children's Law Center, 48 Hours CBS, Channel 8 News, The Hartford Courant, WMAR News, and The Today Show. At the May 9, 2000 juvenile court hearing, testimony was presented that an internet web page, whose webmaster had received information from Ms. B prior to the issuance of the gag order, "talks about the March 13, 2000 hearing regarding the contempt filed against Ms. [B]," Pl.'s Ex. 2 at 6, and also contained information about Baby B's placement after removal from Ms. B's home, Pl.'s Ex. 2 at 11–12, which would be covered by the current gag order if Ms. B only learned the information about Baby B's subsequent placement during the juvenile proceedings.

Ms. B testified that after Judge Damiani's February 22, 2000 gag order, she told her mother and Joanna Wright, the creator of the website, that she had been gagged and could not discuss the proceedings any further, Pl.'s Ex. 2 at 15, and that after March 4, 2000, she refrained from saying anything about the proceedings, Pl.'s Ex. 2 at 16. She testified that prior to the gag order, she communicated information about the substance of expert testimony regarding Baby B's developmental problems and social interactions, to "Senator Cook, Representative Winkler, Senator Dodd, Governor Rowland, [I] mean I can go down the list. [I] have a list as long as my arm." Pl.'s Ex. 2 at 23. Ms. B gave the purpose for her communications as:

> I write a lot of letters advocating for [Baby B.] because of her delays and the harm that has been done to her. And I write a lot of letters. I write everybody trying to get her returned so that she can be healthy again.

Pl.'s Ex. 2 at 24. Ms. B also testified that she contacted the media, although the record contains nothing of the substance of those communications. Pl.'s Ex. 2 at 29. At the June 6, 2000 contempt hearing, a letter published on the website was introduced regarding Baby B "and how DCF and the Court is mishandling this case." Pl.'s Ex. 4 at 5.

This evidence shows that over two years ago, when Ms. B was actively involved in the juvenile proceedings and hoped that she might regain custody of Baby B, she avidly attempted to communicate with the press and public figures to gain support for her cause, on matters which would be covered by the challenged portion of the current gag order (although many of the communications involve only pictures and other identifying information which would have been prohibited from disclosure under the unchallenged portions of the gag order). Now, however, well over two years have passed since the events described in these transcripts became final, and Ms. B did not involve herself in any way in this trial or in any further proceedings on her own behalf. While Brown testified that he had spoken with her, his

testimony lacked precision as to time frame, and in any event Brown was not a competent witness on the substance of her statements to him about her intention to speak publicly about the DCF process utilized with Baby B. While earlier, when the proceedings involving Baby B were ongoing, Ms. B evidently would have spoken to anyone who would listen, once she lost any chance of regaining Baby B it is now just as plausible that she desires to put the trauma of her loss behind her.[2] Thus, the only evidence of Ms. B's intent and willingness to speak is stale and of insufficient probative value on which to base an inference that she is currently willing to speak with Brown. Given the enormity and finality of Ms. B's loss of Baby B,[3] plaintiff's stale evidence falls short of proving that it is any more likely that Ms. B would be still willing to talk to Brown than that she no longer would be willing.

Brown argues that the issuance of defendant's Amended Order on April 15, 2002 manifests a necessity to continue to control Ms. B's speech, establishing a presumption of Ms. B's continued desire to discuss the juvenile proceedings. Brown relies on *Connecticut Magazine v. Moraghan,* 676 F.Supp. 38 (D.Conn.1987), as establishing such a presumption. Indeed, defendant's issuance of the Amended Order well after the termination of the juvenile proceedings and affirmance by the Appellate Court is indeed perplexing, as there is no evidence of any further proceedings between the June 6, 2000 order from which an appeal was taken and

the November 6, 2001 issuance of the Appellate Court's decision. As this order appears to have been prompted by the imminency of this trial and a desire to harmonize the text of the February 22, 2000 gag order with the appellate court's description of it, the Court draws no inference from its issuance that Ms. B is still willing to talk to Brown. *Dow Jones,* decided after *Connecticut Magazine,* clearly instructs that a standing inquiry in this context must assess "whether the news agencies are actually potential receivers of otherwise restrained speech." 842 F.2d at 607.

The trial of this case has adduced insufficient evidence from which the Court can infer or conclude that but for the challenged portions of the order, Ms. B would still be willing to share information covered by the challenged portions of the order with Brown or the public. Accordingly, plaintiff has failed to sustain his burden of proof that he has standing, and therefore the complaint must be dismissed. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102–103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).[4]

### IV.

For the reasons set out above, the complaint is DISMISSED. The Clerk is directed to close this case.

IT IS SO ORDERED.

---

**2.** Brown's counsel represented that Ms. B had moved to California, although there is no evidence to that effect in the record.

**3.** There is no evidence that Ms. B has any avenue for regaining custody of Baby B or that she continues to pursue this goal. The evidence shows that the child has been placed with a new pre-adoptive family and there is no evidence of any further involvement by Ms.

B in any juvenile court proceedings. Inasmuch as the sole purpose of Ms. B's prior communications appears to have been bringing publicity to bear in an attempt to regain custody, this motivation is now gone.

**4.** In light of this conclusion, the Court makes no finding on the merits of Brown's constitutional challenge to the gag order.