STUDENT MEMBERS OF SAME,
et al., Plaintiffs,

v.

Donald H. RUMSFELD, in his official
capacity as U.S. Secretary of
Defense, Defendant.

No. CIV.A.3–03–CV1867 (JCH).

United States District Court,
D. Connecticut.

June 9, 2004.

Jennifer L. Burns, Joseph Landau, Carmine D. Boccuzzi, Jr., Catharine M. Clark, Cleary, Gottlieb, Steen & Hamilton, New York, NY, Stewart I. Edelstein, Cohen & Wolf, P.C., Bridgeport, CT, for Plaintiffs.

William M. Brown, Jr., U.S. Attorney's Office, New Haven, CT, Alan S. Modlinger, U.S. Department of Justice, Washington, DC, for Defendant.

## RULING ON DEFENDANT'S 12(B)(1) MOTION TO DISMISS

HALL, District Judge.

Defendant Donald Rumsfeld, sued in his official capacity as United States Secretary of Defense, moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss the complaint against him for lack of standing and lack of ripeness. For the following reasons, the motion is denied in part and granted in part.

## I. BACKGROUND

Two Yale Law School student organizations, "SAME," which stands for the "Student/Faculty Alliance for Military Equality," and "Outlaws," an organization formed with the goal of educating the Law School community about legal issues affecting lesbian, gay, bisexual and transgender persons, bring this suit against the Secretary of Defense, in his official capacity, on behalf of their student members. The plaintiffs allege that the so-called "Solomon Amendment," which conditions federal funding for universities on the university's willingness to give military recruiters access to campus, violates their student members' First and Fifth Amendment rights, and that the Department of Defense's ("DoD") interpretation of the Amendment is unreasonable.

Since 1978, Yale Law School ("YLS") has prohibited discrimination on the basis of sexual orientation. YLS's Nondiscrimination Policy ("NDP"), which applies to all aspects of YLS life, provides:

> Yale Law School is committed to a policy against discrimination based upon age, color, handicap or disability, ethnic or national origin, race, religion, religious creed, gender (including discrimination taking the form of sexual harassment), marital, parental or veteran status, sexual orientation, or the prejudice of clients. All employers using the school's placement services are required to abide by this policy.

Employers who refused to certify their compliance with the NDP have been barred from school-sponsored recruiting services. Compl. at ¶ 6.

In light of the military's regulations regarding gay and lesbian service members, popularly known as the "Don't Ask Don't Tell" policy, the Department of Defense has refused to certify its compliance with the Law School's NDP and has thus been denied the use of YLS's Career Development Office ("CDO"). Compl. at ¶ 6. Instead, the law school has offered military recruiters open access to classrooms and other meeting spaces on campus for informational sessions and other recruiting ac-

tivities, including interviews, at the invitation of a student organization; open access to any student or student group to reserve a classroom or other meeting space for such a meeting at any time; and open access to student contact information.

In 1995, in light of policies like YLS's NDP, and related controversies over the presence of ROTC programs on university campuses, Congress enacted the Solomon Amendment, codified at 10 U.S.C. § 983. Among other things, the Solomon Amendment denies certain categories of federal funding to institutions of higher education that prevent military recruitment on campus. The Amendment in its current form provides:

**(b) Denial of funds for preventing military recruiting on campus.**—No funds described in subsection (d)(2) may be provided by contract or by grant (including a grant of funds to be available for student aid) to an institution of higher education (including any subelement of such institution) if the Secretary of Defense determines that that institution (or any subelement of that institution) has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents—

(1) the Secretary of a military department or Secretary of Homeland Security from gaining entry to campuses, or access to students (who are 17 years of age or older) on campuses, for purposes of military recruiting; or

(2) access by military recruiters for purposes of military recruiting to the following information pertaining to students (who are 17 years of age or older) enrolled at that institution (or any subelement of that institution):

(A) Names, addresses, and telephone listings.

(B) Date and place of birth, levels of education, academic majors, degrees received, and the most recent educational institution enrolled in by the student.

As discussed more fully in this court's Ruling on Defendant's 12(b)(1) Motion To Dismiss in *Burt. et al. v. Rumsfeld,* 03–cv–1777 (JCH),[1] the current conflict between YLS and the DoD began with a several-year-long series of administrative exchanges between YLS staff and various military recruiting officers regarding the NDP. On May 29, 2002, Colonel Clyde Tate, U.S. Army, then informed Yale University President Richard Levin, "Unless we receive new information from you by July 1, 2002, showing that policies and practices of your institution have been modified to conform with federal requirements . . . we will consider forwarding this matter to the Office of the Secretary of Defense with a recommendation of funding denial." Letter of Clyde Tate to Richard Levin, 5/29/02, Def.'s Mem., Ex. B. To temporarily avoid a funding loss of over $300 million annually for the University, the YLS faculty voted in 2002 to approve a "temporary" suspension of the NDP. Compl. at ¶ 7; Letter of Richard Levin to Colonel Mickey Miller, 9/26/02, Def.'s Mem., Ex. B.

The plaintiffs allege that they, along with many other students, chose YLS because of its non-discrimination policy and message. They contend that the DoD's interpretation of the Amendment as applied to YLS is unreasonable; that it violates plaintiffs' First Amendment right to be part of an association that rejects the message of discrimination, forces them to adopt a message of discrimination, and prevents them from receiving a message of non-discrimination that, but for the DoD, YLS would send. Plaintiffs also argue

---

1. This opinion assumes the reader's familiarity with that Ruling.

that the Amendment is impermissible viewpoint discrimination because it penalizes "only those students, like Plaintiffs, who attend law schools that seek to apply otherwise generally applicable non-discrimination policies to military recruiters." Compl. at ¶ 46. Finally, the plaintiffs argue that the Solomon Amendment, again as applied to YLS, violates their Fifth Amendment equal protection rights. *Id.* at ¶ 49.

## II. DISCUSSION

The Secretary of Defense moves to dismiss the complaint against him pursuant to Rule 12(b)(1) for lack of standing and lack of ripeness. A court may dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) when it lacks the statutory or constitutional power to adjudicate it. *See, e.g., Luckett v. Bure,* 290 F.3d 493, 496–97 (2d Cir.2002). "[T]he plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (internal quotations omitted). Ripeness and standing are both properly considered on a Rule 12(b)(1) motion. *See Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.2003) (discussing 12(b)(6) and 12(b)(1)): *Auerbach v. Board of Educ.,* 136 F.3d 104, 108–09 (2d Cir.1998); *Thompson v. County of Franklin,* 15 F.3d 245, 248 (2d Cir.1994). "In resolving the question of jurisdiction, the district court can refer to evidence outside the pleadings." *Luckett,* 290 F.3d at 496–97.

### A. Standing

The defendant first argues that the students do not have standing to bring this suit, because they have not alleged a cognizable injury in fact, because they have failed to establish causation, and because the rights in jeopardy are in fact Yale University's rights, not those of YLS's stu-dents. The plaintiffs insist that their own rights are at stake.

■ In essence, the standing inquiry focuses on whether a plaintiff is the proper party to bring suit. *See Baur,* 352 F.3d at 632; *see also Becker v. Fed. Election Comm'n,* 230 F.3d 381, 386 n. 3 (1st Cir. 2000) (standing assessed at the time of filing). This inquiry is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd,* 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). In order to have constitutional standing to pursue a claim, a plaintiff must demonstrate: (1) an injury in fact; (2) caused by the conduct complained of; (3) and that such injury is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Lerman v. Board of Elections in City of New York,* 232 F.3d 135, 142 (2d Cir.2000). The defendant does not contest redressability.

■ In general, organizational standing requirements also require that the plaintiff student organizations must satisfy both the generic standing and associational standing requirements. In order to have standing as associations to sue on behalf of their members, they must further show: (1) that their members would otherwise have standing to sue in their own right; (2) that the interests they seek to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Though the defendant has not challenged the plaintiffs' standing to pursue the claims of their

members, the court finds that these requirements are satisfied, to the extent the student members could pursue their own claims, as discussed below.

When standing is raised at the pleading stage, it is "subject to the same degree of proof that governs other contested factual issues." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir.2003); *see also Lujan*, 504 U.S. at 566, 112 S.Ct. 2130 (allegation of injury may be sufficient to survive a motion to dismiss, even if, on a motion for summary judgment, the facts do not exist to support the allegation); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (same); *cf. In re Bennett Funding Group*, 336 F.3d 94, 102 (2d Cir.2003) (denial of motion to dismiss based on standing does not preclude raising the issue again at the summary judgment stage). This means that all facts averred by the plaintiffs must be taken as true for purposes of the standing inquiry, just as for any other issue presented. *Lerman*, 232 F.3d at 142. This favorable presumption includes construing the plaintiffs' general allegations of injury to "embrace those specific facts that are necessary" to support the claim. *Id.* As a result, general factual allegations of injury resulting from the statute and conduct challenged may suffice to establish the plaintiffs' standing. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130. The government principally argues that the plaintiffs have not established the necessary cognizable "injury-in-fact" or causation.

#### 1. Cognizable Injury–In–Fact

The essence of the standing injury requirement is that a plaintiff must "allege such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of

difficult constitutional issues." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be "concrete and particularized," as well as "actual or imminent, not 'conjectural' or 'hypothetical.'" *See Baur*, 352 F.3d at 632 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130). The court must assess whether or not the injury "affect[s] the plaintiff in a personal and individual way." *Id.* (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130), and ensure that the plaintiff's injury is not so abstract as to make the claim incapable of, or otherwise not suitable for, judicial resolution. *Id.* The injury must further be "legally protected." *McConnell v. Fed. Election Com'n*, 540 U.S. 93, 124 S.Ct. 619, 709, 157 L.Ed.2d 491 (2003) (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130).

**a. *Expressive Association.*** The right to expressive association is "implicit in the right to engage in activities protected by the First Amendment." *Roberts v. Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). This right includes the right not to associate, and government actions that force "intrusion into the internal structure or affairs of an association" may unconstitutionally burden this right. *Id.* at 623, 104 S.Ct. 3244. The Supreme Court has observed that associational freedom is "crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of America v. Dale*, 530 U.S. 640, 647–48, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000); *see also FAIR v. Rumsfeld*, 291 F.Supp.2d 269, 304 (D.N.J. 2003) (finding law schools to be expressive associations).

Plaintiffs allege that the DoD's actions have unconstitutionally forced them to allow military recruiters into their association, in violation of the YLS's non-discrimi-

nation principles. The contend that they have a right to be part of an association that sends a particular message with regards to discrimination, and that because of the Solomon Amendment as enforced by the DoD, they are not only required to associate, but to effectively adopt the military's discriminatory message by association, unless they speak out against it.

■ However, the plaintiff student organizations are not the proper parties to bring this associational claim. *See Baur*, 352 F.3d at 632. The principles of the "association" that is YLS are set by the faculty and can change at any time. While the students, as they allege, may have chosen YLS because of its non-discriminatory principles, they have not alleged that they have an institutional voice in how those principles are set or maintained, making the plaintiffs patrons of the YLS association, not themselves members of the association, for purposes of the specific issue here. Though the DoD's actions may give rise to other claims that the students may pursue, as discussed below, the student groups may not sue to vindicate associational claims that are in fact those of YLS, which claims may be and are pursued by its governing authority, its faculty. On this claim, the plaintiffs do not have a cognizable injury-in-fact. The defendant's motion to dismiss the plaintiffs' associational claims is therefore granted.

**b.** *Right to Receive Information.* The plaintiffs also argue that they have a First Amendment right to receive information, including the law school's willing non-discrimination message. The Supreme Court has called the right to receive information "an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." *Board of Educ. v. Pico*, 457 U.S. 853, 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). This right follows from the sender's right to distribute information and is a necessary "predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Id.*

The Supreme Court has applied this right in contexts where the government obstructs a message from a willing speaker. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *see also Gregg v. Barrett*, 771 F.2d 539, 548 (D.C.Cir.1985). These applications include: where a school board attempts to censor materials in a school library, *Pico*, 457 U.S. at 867, 102 S.Ct. 2799; where immigration law obstructed the entry of a foreign organizer into the United States and thus prevented his participation in a debate, *Kleindienst v. Mandel*, 408 U.S. 753, 764–65, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); where government sought to prohibit possession of obscene materials, *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); and where government sought to prohibit teaching of any language except English before eighth grade, *Meyer v. State of Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). *See also Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir.1995).

As Justice Brennan observed in his plurality opinion in *Pico*, the right to receive ideas and information "prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members." *Pico*, 457 U.S. at 868, 102 S.Ct. 2799. The Second Circuit has found the right to be "particularly important for students," and applicable to the receipt of ideas in the educational context. *See Fox v. Board of Trustees of State*, 841 F.2d 1207, 1212 (2d Cir.1988) (right implicated where students sought to receive speech within their dormitory rooms), *rev'd on other grounds*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388

(1989) (government's restrictions did not have to be the least restrictive possible); *see also N.J.-Philadelphia Presbytery of the Bible Presbyterian*, 654 F.2d at 878 (finding students' right to receive information implicated where the state sought to shut down their college for operating without a state license).

■ To demonstrate an injury to their First Amendment rights sufficient to confer jurisdiction, the students must demonstrate that, but for the challenged order, Yale is willing to share information prohibited by the order from being disclosed. *Brown v. Damiani*, 228 F.Supp.2d 94, 97 (D.Conn.2002) (Arterton, J.) ("[p]otential recipients of speech restrained by . . . gag order have standing to challenge such an order.")[2] The students have alleged that they are recipients of the faculty's message, through the NDP, that discrimination against gays and lesbians is wrong and will not be tolerated within the law school community, and that, but for the Solomon Amendment and the defendant's application of it, they would receive that message. They thus have standing to pursue this claim, and the defendant's motion to dismiss the plaintiffs' right to receive information and ideas claim is denied.

**c.** *Viewpoint Discrimination.* The plaintiffs next contend that the defendant's application of the Solomon Amendment to Yale impermissibly discriminates against them because they have chosen to be part of an association that rejects discrimina-

tion against gays and lesbians. *See Rosenberger v. Visitors and Rector of the University of Virginia*, 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.").

■ While a claim of "viewpoint discrimination" is, in the abstract, cognizable, the plaintiffs here are not the proper parties to assert it. The viewpoint alleged to be discriminated against is that of YLS, expressed through policy adopted by the law school faculty. While the plaintiffs might be seen as recipients of the benefits of that viewpoint, in keeping with their right to receive ideas and information claim, the mere fact that they agree with the law faculty's viewpoint does not make their own viewpoint the target of the discrimination. *See Baur*, 352 F.3d at 632 (plaintiff must be proper party to bring suit). The viewpoint discrimination claim is thus dismissed.

**d.** *Equal Protection Claim.* The plaintiff organizations also allege that their gay and lesbian student members are being singled out for uniquely prejudicial treatment based solely on their status as gays and lesbians, because the DoD's policy requires the NDP to be suspended only as to them. *See* Pls.' Opp. at 34. They argue they have been subjected to the

**2.** Though the plaintiffs' claim may eventually fail on the merits, the question of whether the students have standing to attempt to assert such a claim is a distinct one. This aspect of the standing inquiry "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal quotation marks and citations omitted)). Essentially, this requirement calls for an inquiry into "whether the constitutional or statutory pro-

vision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500, 95 S.Ct. 2197. *See also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183, 195 (2d Cir. 2002) (court must reach jurisdiction unless "a controlling decision . . . has already entertained and rejected the same constitutional challenge to the same provision").

"unique and personal harm" of exclusion from participation in an official law school program, branded as second-class citizens, and marked with a stigma that the Supreme Court recognized as illegitimate in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

Courts have long recognized that the Constitution "neither knows nor tolerates classes among citizens." *Romer v. Evans*, 517 U.S. 620, 623, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)) (Harlan, J., dissenting). A statute may violate the equal protection clause because it makes an impermissible classification on its face, or because, as applied, it disadvantages a particular group. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The plaintiffs argue that Congress specifically intended the Solomon Amendment to target university protest of the "Don't Ask Don't Tell" policy, and thus also singled out gays and lesbians, and that gays and lesbians have been the consistent victims of its impact.

 As the Supreme Court has noted in the context of sexual orientation discrimination, "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be obtained." *Romer*, 517 U.S. at 633, 116 S.Ct. 1620. The plaintiffs allege that, due to the defendant's actions, their student members have suffered the personal injury of being subject to the repeal of the NDP as to them only, and that these actions are "arbitrary," unrelated to any legitimate governmental objective. The court notes that the Second Circuit has held the "Don't Ask Don't Tell" policy to be constitutional, making plaintiffs' claim that recruiting functions associated with the policy are *un*constitutional

dubious at best. However, courts must be cautious not to confuse the merits of a claim with a plaintiff's standing to assert it. *Bush*, 304 F.3d at 195. For the reasons discussed above, plaintiffs have standing to pursue their equal protection claim.

## 2. Causation

While the plaintiffs have alleged a cognizable "injury-in-fact" on their First Amendment right to receive ideas and information claim, and their Fifth Amendment equal protection claim, they must also show that their injuries were caused by the defendant's action. The defendant argues that the real cause of any injury to the students is Yale University's choice to accept federal funds, and that the YLS faculty's independent decision to suspend the policy breaks the causation chain.

In order to bring a constitutionally justiciable claim, a plaintiff must, at the pleading stage, allege that the injury was "caused" by the conduct complained of. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. The students allege that, as a result of threats aimed at their law school, and the associated ramifications for other Yale University schools, the YLS faculty have been forced to temporarily suspend the application of the NDP. As further discussed in the court's Ruling on the Defendant's 12(b)(1) Motion in *Burt v. Rumsfeld*, 03–cv–1777 (JCH), the record submitted by the defendant demonstrates that the Army and the DoD have consistently pointed to continuance or the permanent suspension of the NDP as the key indicator of Yale Law School's non-compliance or compliance with the Solomon Amendment. *See, e.g.*, Letter of Colonel Michele Miller to Richard Levin, 10/17/02, Def.'s Mem., Ex. B; Letter of Colonel Michele Miller to Richard Levin, 3/3/03, Def's Mem., Ex. B; Letter from William Carr to Richard Levin, 3/29/03, Def.'s Mem., Ex. B. This clearly

alleges that the suspension of the NDP was "caused by" the conduct complained of. *See Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

The defendant correctly notes that the causation required by Article III is not present where a plaintiff's injury results from the independent act of a third-party. However, the Supreme Court has cautioned the lower courts not to "wrongly equate [ ] injury 'fairly traceable'. to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The "fairly traceable" injury required by Article III may include "injury produced by determinative or coercive effect upon the action of someone else." *Id.*

The Second Circuit's opinion in *Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183 (2d Cir.2002), is instructive here. There, the plaintiffs challenged the executive branch's decision to impose restrictions specifying that, in order to be eligible for USAID funding, a foreign non-governmental organization ("NGO") must certify in writing that it "will not, while receiving assistance under the grant, perform or actively promote abortion as a method of family planning in AID-recipient countries or provide financial support to other foreign nongovernmental organizations that conduct such activities." *Id.* at 188. A plaintiff, a non-profit, domestic advocacy group, argued that the regulations prohibited the foreign NGOs from associating with it, in violation of the First Amendment. The district court denied standing to the plaintiffs, based on the Second Circuit's decision in *Planned Parenthood Federation of America, Inc. v. Agency for International Development*, 915 F.2d 59 (2d Cir.1990), which had evaluated the same restrictions. The district

court found that the "incidental effect" of the funding restrictions on the activities of the domestic NGOs, and the decision of the foreign NGOs to take the money despite the restrictions, did not rise to the level of a constitutional violation.

■■■ The Second Circuit affirmed the dismissal, but on the merits of the plaintiffs' claim, relying on the prudential decision that, since the merits of the claim were clearly disposed of by the *Planned Parenthood* ruling, the panel would decline to reach a "novel question of jurisdiction." *Id.* at 195. The court expressed disapproval, however, of the district court's reliance on *Planned Parenthood*, which was a decision on the merits, to dismiss for lack of standing. *Id.* at 192–93. Similarly, here, the plaintiffs allege that, because of the coercion of the DoD's threat to deprive itself and its sister schools at Yale University of federal funding, the YLS faculty has been forced to suspend the NDP, and that this suspension violates the students' right to receive information and their equal protection rights. This is sufficient to make the plaintiffs' claimed injury "fairly traceable" to the DoD's actions.

The defendant's motion to dismiss for lack of standing is thus granted as to the associational and viewpoint discrimination claims, and denied as to the right to receive ideas and information and equal protection claims.

### B. Ripeness

The defendant also argues that this action should be dismissed because the Department of Defense has not yet issued a final determination as to Yale. The court addressed this argument in its Ruling On Defendant's Rule 12(b)(1) Motion To Dismiss in *Burt v. Rumsfeld*, 03–cv–1777 (JCH), and held there that the faculty plaintiffs' challenge to the statute and regulation as applied is ripe. *See* Ruling at

16–21. The defendant has raised no additional arguments in this case that necessitate a second discussion of this issue here. As a result, for the reasons stated in the *Burt* Ruling, the court reiterates its holding that this matter is ripe for adjudication.

## III. CONCLUSION

For the reasons stated above, the defendant's Motion to Dismiss [Dkt. No. 14] is GRANTED in part and DENIED in part. The court reserves its Ruling on the Rule 12(b)(6) portion of that Motion.

**SO ORDERED.**